UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JONATHAN D. POLESUK, PERI POLESUK                    MEMORANDUM DECISION
and CAMERON POLESUK,                                            AND ORDER
                                                                                    05 CV 8324 (GBD)__
                              Plaintiff,

               -against-


CBR SYSTEMS, INC. a/k/a CORD BLOOD
REGISTRY SYSTEMS, Q INTERNATIONAL
COURIER, INC. a/k/a QUICK INTERNATIONAL
COURIER and AMERICAN AIRLINES, INC.,

                              Defendants.
-------------------------------------------------------------------x
GEORGE B. DANIELS, District Judge:


          Defendant Q International Courier, Inc. a/k/a Quick International Courier ("Quick"), a

common carrier, is moving, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint on the

grounds that the state law claims asserted against it are preempted by the Carmack Amendment

of the Interstate Commerce Act, 49 U.S.C. § 14706.  The Carmack Amendment governs the

liability of interstate carriers for the loss or damage to property during transport.  Quick seeks, in

the alternative, to limit its liability to two hundred dollars ($200.00), which it claims is the

maximum dollar amount provided for in the liability provisions of the parties' bill of lading.

Additionally, Quick is seeking an order dismissing the cross-claims asserted against it by co-

defendant CBR Systems, Inc. ("CBR") or, in the alternative, staying the litigation of such claims

pending arbitration.[1]

---

[1]  In Quick's supplemental memorandum, Quick raises, for the first time, its application
regarding the cross-claims.  It was incumbent upon Quick to file a formal Notice of Motion and
not to simply include its request in its subsequent filings in connection with the pending motions.
See, Fed.R.Civ.P. 7(b);  Local Civil Rule 6.1.  Nevertheless, CBR substantively responded to
Quick's application without raising the issue of the procedural deficiencies in the manner in
which Quick made this application.  Accordingly, the Court will address Quick's motion to

CBR has cross-moved to dismiss the complaint against it "on the grounds that CBR is an implied carrier in the stream of commerce under the 'Carmack Amendment' and as such, CBR's liability should likewise be limited to $200 or in the alternative that CBR is a third-party beneficiary of the bill of lading and by a parity of reasoning CBR's liability therefore should also be limited to $200. To the extent that the Court is not inclined to grant the same remedy and relief to CBR that is requested by Quick, then CBR opposes Quick's motion on the grounds that Quick's motion is premature in light of the fact that no substantive pre-trial discovery has occurred and the facts and circumstances of the loss and evidence necessary to oppose Quick's motion may not be in CBR's possession." (CBR's Mem. at 2).

Additionally, plaintiffs have cross-moved, pursuant to Fed.R.Civ.P. 15(a), for an order granting them leave to amend their complaint to assert additional causes of action against Quick, including a claim under the Carmack Amendment.[2]

The state law causes of action against Quick are dismissed as preempted by the Carmack Amendment. Plaintiffs are granted leave to file an amended complaint, but only to the extent that they may assert a cause of action under the Carmack Amendment against Quick and plead additional factual allegations. CBR's cross-claims against Quick are stayed pending arbitration. The motions are denied in all other respects.

This action arises as the result of the destruction of placenta cord blood while in transit to CBR's facility for cryogenic freezing. The blood was to be stored for the potential future use in

_____

dismiss or stay the cross-claims on the merits.

[2] Defendant American Airlines has not filed any papers in regard to the pending motions. American Airlines made an offer of judgment, pursuant to Fed.R.Civ.P. 68, whereby it offered to allow judgment to be taken against it in the amount of fifty dollars ($50.00).

stem cell therapy for the newborn himself or other family members.   Plaintiffs Jonathan and Peri

Polesuk were allegedly contacted by CBR while Ms. Polesuk was pregnant with her son, the

infant plaintiff.  Plaintiffs allege that CBR "is a clinical-stage biotechnology company in the

business of, among other things, collecting, testing, processing, and preserving umbilical cord

blood ("Cord Blood") - a procedure known as 'banking.'" (Compl. ¶ 3).  Plaintiffs assert that

"Cord Blood, which is also called 'placenta blood,' is the blood that remains in the umbilical

cord and placenta following birth and after the cord is cut.  In the past, Cord Blood was routinely

discarded with the placenta and umbilical cord."  (Id. ¶ 7).  Plaintiffs claim that "[t]he stem cell

found in the cord blood are genetically unique to the baby and the family."  (Id. ¶ 8).  Plaintiffs

contend that "[t]he actual and potential uses of neonatal stem cells found in Cord Blood to treat

and cure disease are significant and growing."  (Id. ¶ 10).

      Plaintiffs allege that CBR sent them various promotional and registration materials

wherein CBR represented that it "is the most trusted name in Cord Blood banking."  (Id. ¶ 16).

Plaintiffs further allege that "via the CBR's website, CBR also made the following

representations to prospective customers with regard to the transportation of the Cord Blood to

CBR:

> 'One-Step shipping service, which requires only a single phone call after
> your baby's birth.  CBR's systems are fully integrated with Quick International
> Courier to provide easy pick-up and seamless tracking . . .'
> and
> 'CBR offers simple, prearranged shipping with an experienced courier,
> requiring only one phone call after your baby's birth.  Our automated tracking
> system is designed to help facilitate timely delivery of your baby's cord blood to
> our laboratory.  You can relax with your new baby while we track your sample

every step of the way.'"  (Id. ¶ 17).[3]

Plaintiffs allege that CBR's representations as to the ease of shipping the cord blood were made for the purpose of inducing plaintiffs to enter into a contract with CBR, and that plaintiffs were so induced.  (Id. ¶¶ 24-24, 27-28).  Plaintiffs allege that CBR's representations, in this regard, were false because "CBR did not use adequate level of standards to transport the [plaintiffs'] newborn son's Cord Blood units to CBR's Cord Blood Banking facility, given the nature and importance of the shipment."  (Id. ¶ 19).  Plaintiffs claim that Quick couriers would deliver the cord blood to CBR's facility by placing it on regularly scheduled airline flights and having other Quick couriers pick up the shipments at the destination airlines' baggage terminals.  (Id. ¶ 22).  Plaintiffs maintain that "[g]iven the nature of the specimens, greater care should have been taken with the materials."  (Id. ¶ 23).

Plaintiffs further allege that immediately after their son's birth in 2003, CBR arranged for Quick to pick up the cord blood unit for transport to CBR's banking facility located in Arizona.[4] (Id. ¶ 29).  Plaintiffs contend that at the time of the pick up, a representative of Quick gave plaintiff Jonathan Polesuk a receipt.  (J. Polesuk Aff. ¶ 9).  Quick maintains that the "receipt" was a bill of lading.  The address for "CBR Systems, Inc. Stem Cell Bank" was preprinted on the

---

[3]  In opposing Quick's motion, plaintiffs submitted copies of CBR's website pages.  The website indicates that, pursuant to CBR's "One-Step Shipping" practice, "[t]he collection kit is pre-labeled and ready to be shipped 'as-is.'" (J. Polesuk Aff. Ex. 6 at 1).  The website further provides that "[t]o take advantage of One-Step Shipping through Quick International, simply call the carrier after your baby's birth," the "collection kit will then be picked up directly from the hospital room."  (Id.).

[4]  In plaintiffs' proposed amended complaint, they allege that immediately following their son's birth, "plaintiffs, in compliance with [their] instructions from CBR, placed a call to Quick to pickup plaintiffs' Cord Blood . . ."  (Proposed Am. Compl. ¶ 30).

4

delivery information portion of the form.  Jonathan Polesuk's signature appears in the spaced

designated for "Shipper's Signature."  In the "Special Instruction" section, the phrase

"UMBILICAL BLOOD FOR STORAGE" was preprinted.  The form contains two boxes that the

shipper may check: one is for "Basic $200 Insurance" and the other is "Shipper Waives

Insurance."  Neither box was marked.  Additionally, the area allowing for the monetary insurance

value to be filled in was left blank.  The form provides that the "Shipper certifies that the

commercial value, nature of the goods, and the content are true and correct, assumes

responsibility for charges, and agrees to conditions on the reverse side."

Plaintiffs maintain that the reverse side of the form given to them was blank; a claim

which Quick disputes.  Quick submitted a photocopy of the front side of the bill of lading

allegedly issued to plaintiffs at the time of the pick up, as well as a copy of the front and back of

a sample bill of lading form, which Quick was allegedly utilizing in 2003.  (Greenberg Aff. ¶¶ 2-

3, Ex. A, B).  Quick's copy of the purported bill of lading issued to plaintiffs differs from the

form submitted by plaintiffs.  Plaintiffs' form identifies itself as "QUICK BILLING COPY 2."

The form submitted by Quick, although somewhat blurred, does not state it is a billing copy.  The

sample bill of lading form, which Quick claims is similar to the bill of lading at issue, identifies

itself as "SHIPPER'S RECEIPT 1."  On the reverse side of the sample copy of shipper's receipt

form, it states, in part:

> Acceptance of this bill of lading by the shipper shall constitute the shipper's
> agreement to the following:
>
> 2.  The shipment is insured by Quick for loss, damage or destruction, irrespective
> of the cause including but not limited to negligence, to actual fair market value
> (limit $200.00) during pick-up, transport and delivery.  There is a charge of $3.00
> for this insurance and it will be charged automatically unless shipper waives all

coverage by checking appropriate box on front of this bill of lading.  The
responsibility of Quick under this paragraph shall be reduced to the extent of the
value of any insurance carried by the shipper [f]or any lost or damaged shipment.

3.  Quick shall not be liable for any loss other than or in an amount in excess of
that which is described in paragraph 2 above unless arrangements concerning the
same are made in advance of shipment.  Shipper may request additional insurance
up to a maximum of $5,000.00 per shipment by showing the amount on the face
of this bill of lading and by paying an additional fee as agreed to by the shipper
and Quick.  The additional valuation and fee must be agreed upon by Quick prior
to shipment and must be entered on the face of this bill of lading.

Plaintiffs maintain that when they contacted CBR twenty-four hours after handing over

the cord blood, CBR informed them that the cord blood had been destroyed.  Plaintiffs allege that

"while the Cord Blood was being transported from the Quick Courier to American Airlines, the

Cord Blood units were completely destroyed."  (Compl. ¶ 37).  CBR allegedly advised plaintiffs

that a gust of wind caused the box containing the blood to fall from a luggage cart onto the

tarmac at an airport in Texas.  A truck subsequently ran over the box destroying the cord blood.

 Plaintiffs contend that "Quick was negligent by failing to use its promised highest level

of standards to transport Plaintiffs' Cord Blood . . ., failing to have a secure chain of custody in

play for Plaintiffs' Cord Blood shipment to ensure delivery within 32 hours of birth and failing to

have a proper standard of care for handling such fragile and irreplaceable goods."  (Id. ¶ 45).

Plaintiffs further claim that Quick had negligently interfered with plaintiffs' contract with CBR

because, despite Quick's knowledge that the failure to timely deliver the cord blood could

threaten its viability, Quick negligently failed to transport the blood in a timely fashion in that it

failed to take ordinary and basic precautions to protect the shipment and to treat it as a fragile,

perishable and unique item.  (Id. ¶¶ 50, 51).

Plaintiffs have asserted claims against CBR for fraud, breach of contract and negligence.

The two cause of action asserted against defendants Quick and American Airlines are pled as

state law claims for negligence and negligent interference with a contract.[5]  CBR has asserted

cross-claims against Quick and American Airlines for contractual indemnification, common law

indemnification, breach of contract for failing to obtain insurance coverage, and contribution.

Plaintiff is seeking to amend the complaint to add three additional causes of action

against Quick, namely: tortious interference with a contract for allegedly intentionally interfering

with plaintiffs' contract with CBR; a Carmack Amendment claim, and a breach of Quick and

CBR's "Professional Service Agreement" ("Service Agreement").  With regard to the proposed

claim for breach of the Service Agreement, plaintiffs contend that they were third-party

beneficiaries to that contract.

The Service Agreement provides that Quick was to act as a "Contractor" to provide

delivery of the cord blood to CBR's facilities.  Paragraph six of the Service Agreement states, in

pertinent part:

> RELATIONSHIP OF PARTIES.  The relationship between the Parties is solely an
> independent contractor relationship.  Contractor and its agents and employees are
> not agents or employees of CBR, and have no authority to act for or on behalf of
> CBR or to bind CBR to any contract or in any manner without the express
> approval in writing of CBR.  (Grande Decl. Ex. A ¶ 6).

Pursuant to the terms of the Service Agreement, Quick "assumes liability for, and hereby

agrees to indemnify, defend, and hold harmless CBR . . . from and against any and all liabilities,

obligations, losses, damages, expenses, costs (including reasonable attorneys' fees), injuries and

---

[5]  New York State does not recognize the tort of negligent interference with a contract.
Alvord & Swift v. Stewart M. Muller Constr. Co., Inc., 413 N.Y.S.2d 309, 312 (N.Y. 1978);
Barry & Sons, Inc. v. Instinct Prods. LLC, 788 N.Y.S.2d 71, 73 (N.Y. App. Div. 2005) (citations
omitted); Rosario-Suarz v. Wormuth Bros. Foundry Inc., 649 N.Y.S.2d 225, 227 n.2 (N.Y. App.
Div. 1996).

claims of any kind, arising out of the acts or failure to act of Contractor . . ." (Id. ¶ 9).  The

Service Agreement requires Quick to maintain, *inter alia*, "[p]rofessional liability coverage,

including coverage for errors and omissions, of at least $1,000,000."  (Id.12(a)).  Additionally,

Quick was to obtain comprehensive general liability coverage, and "[c]argo insurance coverage

in the amount of $1,200.00 per work order for the loss, destruction or delay exceeding 72 hours

from the time of pick up."  (Id. ¶ 12(b), (e)).  CBR was to be named as an additional insured on

such insurance policies.  (Id. ¶ 12).  The Service Agreement further provides that it is to "be

governed by and construed according to the laws of the State of California."  (Id. ¶ 22).  The

Agreement states that, "a dispute under this Agreement" which cannot be resolved through

mediation and other appropriate dispute resolution, "shall be settled by arbitration to be held in

California, pursuant to the rules of the American Arbitration Association."  (Id. ¶ 24).

     After the instant action was filed, CBR sent Quick a "letter to serve as a formal tender of

the defense and indemnity on behalf of CBR and [CBR] request[ed] that Quick immediately

honor its obligations [under the Service Agreement] to defend and indemnify CBR in this

action."  (Grande Decl. Ex. B at 3).  Quick advised CBR that "[t]he tender [was] rejected because

the allegations made against [CBR] in this action sound in fraud and/or breach of contract and

are not covered by the indemnification provision in the Agreement, which excludes damages due

to willful acts of CBR." (Grande Decl. Ex. C).

     In reviewing a complaint for dismissal under Rule 12(b)(6), the Court must accept the

factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor.

Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).  The complaint should

only be dismissed where it appears beyond doubt that plaintiffs can present no set of facts

entitling them to relief.  Conley v. Gibson, 355 U.S. 41, 46 (1957); Ryder Energy Distrib. Corp.

v. Merrill Lych Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984).  On a motion to dismiss,

pursuant to Fed.R.Civ.P. 12(b)(6), the Court is precluded from considering matters outside the

complaint.  Courtenay Commc'n, Corp. v. Hall, 334 F.3d 210, 213 (2d Cir. 2003).  In this regard,

the complaint includes any statements or documents incorporated by reference into the

complaint.  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (*quoting* Int'l

Audiotext Network, Inc. v. Am. Tel. & Tel., Co., 62 F.3d 69, 72 (2d Cir. 1995)).[6]


## THE PARTIES' ARGUMENTS

Quick argues that the complaint should be dismissed because the state law claims

asserted against it, in the complaint and proposed amended complaint, are preempted by the

Carmack Amendment.  Quick alternatively argues that the terms of the subject bill of lading

limits its liability to $200.  Quick contends that the bill of lading form expressly provided that the

shipment was insured for its fair market value (limit $200.00) by Quick for loss or damage,

unless the shipper opted to purchase additional insurance, which the plaintiffs failed to do.

Quick contends that the bill of lading "form complies with the federal common law requirements

that the carrier give the shipper an option of greater protection in order to limit its liability."

(Quick's Mem. at 7).  Specifically, the form had boxes designated for the basic $200 insurance

---

[6]  Among the materials submitted by the parties are: (1) the Service Agreement; (2) copies of the form signed by Mr. Polesuk; and (3) a page of CBR's website.  Since plaintiffs rely on such documents in the drafting of their original and proposed amended complaints, consideration of these materials is appropriate.  Additionally, Quick submitted a sample bill of lading form. Reference to this form is limited solely to providing a context in which to examine the parties' arguments, and not in regard to the substantive merits of the motions themselves.

and for additional insurance coverage, and the reverse side of the form contained a notice that Quick's liability is limited to $200 unless the shipper elected to buy additional insurance.

CBR asserts that it is seeking the same relief as Quick.  CBR contends that its liability is limited because the applicability of the Carmack Amendment extends to CBR as it is an implied carrier, as well as a third-party beneficiary of the bill of lading.  In the event that the Court rejects CBR's claims that it too is entitled to the protections of the Carmack Amendment, CBR argues that Quick's motion should be denied without prejudice.  CBR argues that Quick's motion is premature because CBR needs discovery in order to obtain the necessary evidence to oppose the motion.  Specifically, discovery is necessary regarding what other arrangements, if any, plaintiffs made with Quick for the shipment of the cord blood, and whether the loss of the cord blood was wanton, willful or constituted gross negligence, or whether any party, including Quick, acted with unclean hands.

Additionally, CBR, as well as the plaintiffs, maintains that this is a case of first impression with regard to the applicability of the Carmack Amendment to shipments of umbilical cord blood.  Hence, the motion to dismiss should be denied because the facts of this case presents a unique legal issue.  CBR contends that it is unclear whether cord blood constitutes property, freight, goods, or a package within the meaning of the Carmack Amendment.  They further argue that the liability limitation provisions, upon which Quick relies, may be void against public policy given the nature of the shipment and the totality of the circumstances surrounding this case.  CBR asserts that "[i]n theory, Quick was shipping a potentially life-saving substance . . ." (CBR's Mem. at 9).  CBR further argues that even if the Carmack Amendment applies, Quick may not be able  to limit its liability by virtue of the fact that plaintiffs were allegedly afforded a

10

choice of insurance on the bill of lading because it is unclear whether $200, or even the

maximum $5,000 insurance available, is sufficient to adequate compensate plaintiffs for their

loss.

Plaintiffs further argue that the Carmack Amendment is inapplicable because they are not

"shippers."  Plaintiffs contend that they did not enter into a contractual relationship with Quick

and, to the extent that any agreement exists, it is between Quick and CBR.  They claim that "[t]o

permit Quick to rely upon the Carmack Amendment vis-a-vis the [plaintiffs] would allow Quick:

(1) to be protected against [plaintiffs] without the [plaintiffs] having an opportunity to negotiate

the terms with Quick such as asking for or obtaining additional insurance; and (2) void its

contract with CBR (or effectively make the contract a nullity despite Quick's representations

therein to the contrary)."  (Pls.' Mem. Opp'n Quick's Mot. to Dismiss at 8).  Plaintiff further

claims that the back of the receipt given to them by Quick did not contain any language limiting

Quick's liability.

## THE CARMACK AMENDMENT

### I. <u>Preemption</u>

The Carmack Amendment "addresses the subject of carrier liability for goods lost or

damaged during shipment, and most importantly provides shippers with the statutory right to

recover for the *actual loss* or injury to their property caused by any of the carriers involved in the

shipment."  <u>Cleveland v. Beltman N. Am. Co., Inc.</u>, 30 F.3d 373, 377 (2d Cir. 1994) (emphasis in

original).[7]  The Carmack Amendment also preserves the common law right of a carriers to limit

their liability exposure.[8]

      The issues raised by plaintiffs and CBR regarding whether Quick complied with the

necessary requirements to limit its liability, as well as whether any limitation of liability should

be void against public policy, have no bearing on whether the Carmack Amendment preempts the

state law claims asserted against Quick.  Such matters relate solely to whether any recovery

against Quick, for a cause of action brought under the Carmack Amendment, is limited to a

maximum of $200.  Notwithstanding CBR and plaintiffs' contentions to the contrary, no

discovery is necessary with regard to Quick's motion to dismiss on preemption grounds.  See,

Taylor v. Mayflower Transit, Inc., 22 F.Supp.2d 509, 511 (W.D.N.C. 1998) (Finding that

plaintiffs, in claiming that discovery is necessary to resolve the issue of whether the Carmack

Amendment applies, are confusing the issues of the application of the Amendment with

_____

[7]  The Carmack Amendment provides, in pertinent part:

A carrier providing transportation . . . shall issue a receipt or bill of lading for
property it receives for transportation . . .   That carrier and any other carrier that
delivers the property and is providing transportation . . . are liable to the person
entitled to recover under the receipt or bill of lading.  The liability imposed under
this paragraph is for the actual loss or injury to the property caused by (A) the
receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line
or route the property is transported in the United States or from a place in the
United States to a place in an adjacent foreign country when transported under a
through bill of lading and . . .   Failure to issue a receipt or bill of lading does not
affect the liability of a carrier.  49 U.S.C. § 14706(a)(1).

[8]  Section 14706(c)(1)(A) of 49 U.S.C. provides: "[A] carrier . . . may . . . establish rates
for the transportation of property . . . under which the liability of the carrier for such property is
limited to a value established by written or electronic declaration of the shipper or by written
agreement between the carrier and shipper if the value would be reasonable under the
circumstances surrounding the transportation."

defendants' limitation of liability.).

The only appropriate issue raised, with regard to the applicability of the Carmack Amendment, is whether it applies to shipments of cord blood.  Whether cord blood constitutes "property," for purposes of the Amendment presents purely a question of law, resolution of which is not dependent on the development of a factual record.  Despite opponents' purported need for discovery, they have not identified any specific item of discovery relating solely to this limited issue.  No additional factual information will have any bearing on the legal question whether shipments of cord blood fall within the scope of the Carmack Amendment or whether the claimed "potential, life-saving" nature of the shipment warrants its exemption under the Amendment.

The Amendment imposes liability upon interstate carriers for "the actual loss or injury to the property" occurring during transportation.  49 U.S.C. § 14706(a)(1) (emphasis added)  The statutory language of the Carmack Amendment of the Interstate Commerce Act speaks in terms of the transportation of "property."  However, "[t]he Interstate Commerce Act does not define "property."  Woodfeathers, Inc. v. Washington County, Oregon, 180 F.3d 1017, 1022 (9th Cir. 1999); see also, Interstate Commence Comm'n v. Browning-Ferris Indus., Inc., 529 F.Supp 287, 289 (N.D.Ala. 1981) ("Congress conspicuously omitted a definition of 'property' from the Interstate Commerce Act.").  Prior to its abolishment in 1996, the Interstate Commerce Commission ("ICC") was vested with jurisdiction over interstate transportation by a motor carrier transporting passengers and property.  See, Interstate Commerce Commission Termination Act of 1995, Pub.L. N. 104-88, 109 Stat. 803.  The ICC had observed that the word "property" "is subject to many different meanings.  'Property' connotes ownership as well as

13

value.  Something that is owned can be 'property' notwithstanding its lack of economic value."

Nuclear Diagnostic Labs., Inc., Contract Carrier Application, 1979 WL 11177, at *2, 131 M.C.C.

578, 580 (I.C.C. June 4, 1979) (internal quotation marks and citations omitted).  However, the

Ninth Circuit Court of Appeals, in AGG Enterprises v. Washington County, 281 F.3d 1324 (9th

Cir. 2002), observed that the ICC case law interpreting the term "property" is irrelevant for

purposes of a preemption analysis.  Rather, the proper focus is whether Congress had a clear and

manifest intent to preempt state and local regulation relating to the transportation of property by

carriers.  AGG Enters., 281 F.3d at 1329 (Addressing the scope of the Federal Aviation

Administration Authorization Act's preemption of state regulation of motor carriers transporting

property.); cf., Wilson v. IESI N.Y. Corp., - - F.Supp.2d - -, 2006 WL 2136307, at *9 (M.D.Pa.

July 28, 2006) (In contemplating the definition of "property," the district court questioned

whether any deference should be afforded to the ICC's decisions in light of its abolishment and

the subsequent transfer of its regulatory functions over motor carriers.).

        "The 'ultimate touchstone' of a preemption analysis is congressional intent:  'Congress'

intent, of course, primarily is discerned from the language of the pre-emption statute and the

statutory framework surrounding it.'"  Green Mountain R.R. Corp. v. Vermont, 404 F.3d 639,

641 (2d Cir. 2005) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86 (1996)).  "State law is

preempted implicitly where the federal interest in the subject matter regulated is so pervasive that

no room remains for state action indicating an implicit intent to occupy the field, or where the

state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment

of its objectives."  Roundout Elec., Inc. v. NYS Dep't of Labor, 335 F.3d 162, 166 (2d Cir.

2003).

14

No legislative history exists in connection with the enactment of the Carmack Amendment as it was adopted without discussion or debate.  Cleveland, 30 F.3d at 377 (*citing* 40 Cong.Rec. 7075 (1906).  The courts have clearly articulated Congress' intent in enacting the Amendment, as well as Congress' understanding that its preemptive force would be broad and sweeping.  The Amendment was enacted to establish a nationally uniform policy governing the interstate carriers' liability for property loss so as not to subject carriers to diverse policies and legislation of varying states.  Adams Express Co. v. Croninger, 226 U.S. 491, 503 (1913); New York, N.H. & H.R.R. Co. v. Nothnagle, 346 U.S. 128, 130 (U.S. 1953).  To effectuate the goal of national uniformity, the Amendment preempts all state law claims arising in connection with the interstate shipment of property by carriers.  Adams Express, 226 U.S. at 505-506 ("Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it.").  "Congress has created a broad, comprehensive scheme covering the interstate shipment of freight . . . [which] occupie[s] the field to the exclusion of state law."  N. Am. Phillips Corp. v. Emery Air Freight Corp., 579 F.2d 229, 233-34 (2d Cir. 1978).  As the Second Circuit Court of Appeals explained:

> In enacting it Congress intended to provide interstate carriers with reasonable certainty and uniformity in assessing their risks and predicting their potential liability.  The Carmack Amendment did this both by establishing a single uniform regime for recovery by shippers directly from the interstate common carrier in whose care their items are damaged, and by preempting the shippers' state and common law claims against a carrier for loss or damage to goods during shipment.  Project Hope v. M/V IBN SINA, 250 F3d 67, 73 n.6 (2d Cir. 2001) (internal quotation marks, brackets and citations omitted).

The Carmack Amendment is "comprehensive enough to embrace responsibility for all

losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation . . ." Georgia, Florida, Alabama Ry. Co. v. Blish Milling Co., 241 U.S. 190, 196 (1916). There is no question that the Carmack amendment preempts state common law remedies that might be asserted against a carrier for damages to goods shipped under a proper bill of lading. Cleveland, 30 F.3d at 378. It is the exclusive remedy available to a shipper to recover damages from a carrier. Id. at 380-82.

An examination of the statutory language of the Carmack Amendment, in conjunction with its legislative purpose, reveals that the term "property," as used therein was intended to refer generally to any interstate shipment of a tangible item under a bill of lading or receipt, as oppose to denoting a particular type or category of property. The Amendment was intended to completely dominate the area of interstate carriers liability for the loss or damage to an item during transportation without regard to the nature of the matter being shipped. To make the applicability of the Carmack Amendment contingent upon the nature of the item circumvents the very purpose for the Amendment, i.e., to create a national uniform system whereby interstate carriers could reasonably assess their risk and predict their potential liability. To engage in an individual and arbitrary assessment as to the inherent nature of the content of a shipment in order to determine whether it is the proper subject of the Carmack Amendment would engender an atmosphere of uncertainty; precisely what the Amendment sought to eliminate.

Presumably had Congress wished to place biological material possessing potentially lifesaving qualities outside the reach of the Carmack Amendment it would have specifically provided for its exclusion as it did in regard to other types of property. The Carmack Amendment only applies to motor carriers "subject to jurisdiction under subchapter I . . . of

16

chapter 135 . . ."  49 U.S.C. § 14706(a)(1).  Exempted from such jurisdiction include motor

vehicles transporting, *inter alia*, ordinary livestock, agricultural commodities, and seafood which

has not been treated for preserving.  49 U.S.C. § 13506(a)(6)(A), (B), (D); see also, Taiyo

Americas, Inc. v. Honey Transport, Inc., 464 F.Supp. 1249 (S.D.N.Y. 1979) (Finding seafood

shipment was exempt from the provisions of the Carmack Amendment.).  Statutorily providing

that certain identified categories of property are exempt, for purposes of the Carmack

Amendment, gives rise to an inference that Congress intended to limit the exceptions to the ones

stated.  See, United States v. Johnson, 529 U.S. 53, 58 (2000) ("When Congress provides

exceptions in a statute, it does not follow that courts have authority to create others.  The proper

inference . . . is that Congress considered the issue of exceptions and, in the end, limited the

statute to the ones set forth."); see also, Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17

(1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition,

additional exceptions are not to be implied, in the absence of evidence of a contrary legislative

intent."); B.F. Goodrich v. Betkoski, 99 F.3d 505, 517 (2d Cir. 1996) ("The canon of

construction that says 'expressio unius est exclusio alterius' cautions against creating additional

exceptions to complex statutory exceptions.").  There is no basis to believe that Congress was

unaware that urgent medical and potentially lifesaving substances are regularly transported by

interstate carriers when it limited the types of  property that fall outside the scope of the

Amendment.

Although CBR claims that it is unclear whether cord blood constitutes property, freight,

goods or a package for purposes of the Carmack Amendment, it offers no other designation to

ascribe to such shipments.  To exclude cord blood from any recognized shipment category would

result in the creation of an amorphous category free from established regulations and laws.  There is no legal justification for such a result.

Courts have previously adjudicated claims brought under the Carmack Amendment for loss or damage to shipments of blood.  See eg., Pharma Bio, Inc. v. TNT Holland Motor Express, Inc., 102 F.3d 914 (7th Cir. 1996); Bio-Lab, Inc. v. Pony Express Courier Corp., 911 F.2d 1580 (11th Cir. 1990).  Moreover, human remains have been classified as "goods" and "freight" in actions for injuries to goods transported by international and domestic air transportation.  See eg., Onyeanusi v. Pan Am, 952 F.2d 788 (3d Cir. 1992) (Finding that excluding human remains from the definition of "goods" would exempt a significant number of claims, thus exposing air carriers to inestimable liability and would undermine the goal of uniformity.); Johnson v. Am. Airlines, Inc., 834 F.2d 721, 723-24 (9th Cir. 1987) (Concluding that only if the shipper had opted to declare an excess value for the remains on the air waybill, "could the plaintiffs expect to have the shipment treated as other than 'goods.'"); Milhizer v. Riddle Airlines, Inc., 185 F.Supp. 110, 113 (E.D.Mich. 1960) ("Considering the fact that the shipment in issue here was accepted as a piece of freight and handled as such and that the transportation rates applicable to air freight in general were applied, it is difficult to see why a box of human remains should not fall into the category of air freight in general."), aff'd, 289 F.2d 933 (6th Cir. 1961).

In finding that human remains fall within the definition of "goods," the Third Circuit explained:

> Human remains can have significant commercial value, although they are not typically bought and sold like other goods.  * * *  Human tissue and organs which are taken from the recently deceased have inestimable value in transplant operations.  Although remains which are used for these medical and scientific purposes are usually donated, rather than bought and sold, this does not negate

their potential commercial value.   * * *   Notwithstanding the legality of selling
some parts of the human body, most notably blood and sperm, we believe these
state laws against organ and tissue sales are premised on moral and ethical, rather
than economic considerations.  In fact, the very existence of these state laws
indicates that there would be a market for human remains in the absence of
government intervention.  Onyeanusi, 952 F.2d at 792.

In other legal areas unassociated with transportation, blood and other bodily fluids have

been held to constitute property.  See eg., United States v. Garber, 607 F.2d 92, 97 (5th Cir. 1979)

(For tax purposes, extremely rare "blood plasma . . . like any saleable part of the human body, is

tangible property."); see also, Kurchner v. State Farm Fire & Cas. Co., 858 So. 2d 1220 (Fla.Dist.

Ct. App. 2003) (Florida State court held that destruction of cryopreserved sperm is "property

damage," as oppose to "bodily injury" under terms of insurance policy because sperm outside the

body is property as it is no longer part of the body.).

As ordinarily used, the word "property" means the thing possessed.  See, Wells Fargo &

Co. v. Mayor and Aldermen of Jersey City, 207 F. 871, 876 (D.N.J. 1913), aff'd, 219 F. 699 (3d

Cir. 1915).  With regard to property interests, the United States Supreme Court has "never held

that a physical item is not 'property' simply because it lacks a positive economic or market

value."  Phillips v. Washington Legal Found., 524 U.S. 156, 169-70 (1998).  The Supreme Court

explained that "property is more than economic value; it also consists of the group of rights

which the so-called owner exercises in his dominion of the physical thing, such as the right to

possess, use and dispose of it."  Id. at 170 (internal citations and quotation marks omitted); see

also, Black's Law Dictionary (8th ed. 2004) (Defining property as "[t]he right to possess, use, and

enjoy a determinate thing . . .; the right of ownership).  The Second Circuit Court of Appeals

recognized that, in the context of an action for the loss of a donated organ instituted by the

plaintiff-intended recipient, the use of the term "property" is not merely a legal fiction because the plaintiff has a practical use for the organ.   Colavito v. New York Organ Donor Network, Inc., 438 F.3d 214 (2d Cir. 2006).

Thus, a finding that shipments of cord blood constitute "property" for purposes of the Carmack Amendment is consistent with both the purpose and intent of the Amendment, and with property law in general.

Plaintiffs' additional argument, that the Carmack Amendment is inapplicable because they are not "shippers," is unavailing.   "A 'shipper' is defined as '[o]ne who tenders goods to a carrier for transportation.'"   Am. Home Assurance Co. v. ZIM JAMAICA, 418 F.Supp.2d 537, 538 n. 1 (S.D.N.Y. 2006) (*quoting* Black's Law Dictionary 1383 (7th ed. 1999)).   This definition is applicable to plaintiffs.   Plaintiffs tendered the cord blood to the Quick carrier to be transported to CBR's facility, and Mr. Polesuk even signed the "receipt" as the shipper.   In any event, the Carmack Amendment does not limit the class of plaintiffs that may seek recovery thereunder to only shippers.   Rather, such an action may be brought by any person entitled to recover under the receipt or bill of lading.   See generally, 49 U.S.C. § 14706(a)(1); see also, Esprit de Corp. v. Victory Express, Inc., 111 F.3d 138, 1997 WL 191466, at *1 n.3 (9th Cir. 1997) (unpublished decision) ("[T]he Carmack Amendment does not restrict recovery to 'shippers.'").   Any individual to whom the carrier owes a duty to transport an item is a proper party plaintiff to maintain a Carmack action against a carrier.   See eg., Windows, Inc. v. Jordan Panel Sys. Corp., 177 F.3d 114, 117-18 (2d Cir. 1999) ("Suits under the Carmack Amendment may be brought against a carrier by any person entitled to recover in the carrier's 'bill of lading,' including the buyer who was to receive the goods[,]" as well as the seller thereof.) (citations omitted);

Travelers Indem. Co. of Illinois v. Schneider Specialized Carriers, Inc., 2005 WL 351106, at *6 (S.D.N.Y. Feb. 10, 2005) (Finding that the consignee and subrogee are bound by the Carmack Amendment.).

Finally, there is no merit to plaintiffs' argument that their claims fall outside the scope of the Carmack Amendment because they did not directly contract with Quick.  The lack of contractual privity does not render the Amendment inapplicable.  See, Esprit de Corp., 1997 WL 191466, at *1 ("The Carmack Amendment . . . holds a 'common carrier' liable for loss or injury to goods incurred during transport, regardless of the lack of contractual privity.").

Accordingly, plaintiffs' action against Quick for the loss of the shipment of cord blood is governed by the Carmack Amendment.  Thus, by virtue of the preemptive scope of the Amendment, plaintiffs are precluded from maintaining any state law causes of action against Quick premised on the loss of, or damage to, the cord blood while in transit.  Dismissal of the pending state law causes of action against Quick are therefore warranted.

Plaintiffs seek leave to file an amended complaint to add two additional state law causes of action against Quick, as well as a claim under the Carmack Amendment.  Quick has not advanced any specific argument in opposition to plaintiffs' request to add a Carmack cause of action.  Leave to amend should be freely given when justice dictates.  Fed.R.Civ.P. 15(a); Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234-35 (2d Cir. 1995).  Where there is neither a showing of the movants' undue delay, bad faith or dilatory motive, nor a showing of undue prejudice to the opposing party by virtue of allowance of the amendment, leave to amend should be granted.  Foman v. Davis, 371 U.S. 178, 182 (1962); see also, Grace v. Rosenstock, 228 F.3d 40, 53-54 (2d Cir. 2000).  Where the additional proposed causes of action would not

withstand a motion to dismiss, the granting of leave to add such claims would be futile, and hence the motion should be denied accordingly.  See, Journal Publ'g Co. Am. Home Assurance Co., 771 F.Supp. 632, 635 (S.D.N.Y. 1991) *(quoting* Glick v. Koenig, 766 F.2d 265, 268 (7th Cir. 1985)); see also, Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993).

The circumstances warrant granting plaintiffs an opportunity to file an amended complaint to assert a Carmack cause of action against Quick.  See generally, Miracle of Life, LLC v. N. Am. Van Lines, Inc., 368 F.Supp.2d 494, 498-99 (D.S.C. 2005) (Instead of re-characterizing plaintiffs' state law claims as asserting Carmack Amendment claims, the court determined that "the more prudent course of action is to grant Plaintiffs leave to amend their complaint to properly assert Carmack claims.").  Regardless of how plaintiffs designate the proposed state law causes of action, they are nothing more than claims seeking to recover for the loss of property which was being transported by an interstate carrier.  The claims are not premised on any alleged wrongful conduct committed by Quick which is separate and distinct from the loss of the shipment of cord blood.  Therefore, granting leave to amend the complaint to assert these additional state law causes of action would be futile because they too are preempted by the Carmack Amendment.

Accordingly, the state law claims against Quick are dismissed, and plaintiffs are granted leave to file an amended complaint to add a Carmack claim.

## II.  Limitation of Liability

### Quick's Limitation of Liability

A carrier may not exempt itself from all liability for the loss or damage to property due to

the carrier's own negligence.  Adams Express, 226 U.S. at 503.  Agreements that allow a carrier to completely exculpate itself from liability are violative of public policy as "they would tend to invite carelessness on the part of the carrier."  Shippers Nat'l Freight Claim Council, Inc. v. Interstate Commerce Comm'n, 712 F.2d 740, 746 (2d Cir. 1983).  The Carmack Amendment does  provide a means by which carriers may limit their liability exposure.  Such limitations are not deemed to be an attempt by the carrier to exonerate itself from losses attributable to its own negligence.  Rather, they operate to provide the carrier with knowledge of the extent of its potential liability for the loss or damage to the property so that the carrier may seek to be compensated in proportion to the risk it assumes.  Id. at  746.

"[A] carrier's ability to 'limit [its] liability is a carefully defined exception to the Carmack Amendment's general objective of imposing full liability for the loss of shipped goods; courts, thus carefully scrutinize agreements purporting to limit such liability.'"  Emerson Elec. Supply Co. v. Estes Express Lines, Corp., 451 F.3d 179, 186 (3d Cir. 2006) (quoting Carmana Designs, Ltd. v. N. Am. Van Lines, Inc., 943 F.2d 316, 319 (3d Cir. 1991)).  "'[T]he proper test to be applied to every limitation of the common-law liability of a carrier [is] its just and reasonable character . . .'"  Shippers Nat'l, 712 F.2d at 747 (internal alteration and emphasis in original) (quoting Hart v. Pennsylvania R.R., 112 U.S. 331, 342 (1884)).  "Accordingly, so long as the limitation of liability was the result of a fair, open, just and reasonable agreement between carrier and shipper, entered into by the shipper for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk, and the shipper was given the option of higher recovery upon paying a higher rate, the agreement was enforceable at common law."  Id. at 746 (internal quotation marks and citations omitted).

"The federal common law requirement that the carrier give the shipper an option of greater protection in order to limit its liability validly is called the 'release-value doctrine.'" Kemper Ins. Cos. v. Federal Express Corp., 115 F.Supp.2d 116, 122 (D.Mass. 2000), aff'd, 252 F.3d 509 (1st Cir. 2001).  "[U]nder the 'released value' doctrine, contractual provisions that merely limit carrier liability for lost or damaged cargo . . . ordinarily are valid and enforceable so long as they (1) are set forth in a reasonably communicative form, so as to result in a fair, open, just, and reasonable agreement, between the carrier and shipper; and (2) offer the shipper a possibility of higher recovery by paying the carrier a higher rate."  Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight, Sys., Inc., 235 F.3d 53, 59-60 (2d Cir. 2000) (citations and internal quotation marks omitted).  The released value doctrine does not require that the alternative liability limit offered by a carrier be the full value rate.  Kemper, 252 F.3d at 513, 515.

The granting of Quick's alternative application to limit its liability to $200 is precluded by the existence of a number of disputed factual issues pertaining to whether Quick satisfied all the legal prerequisites necessary to entitle it to limit its liability.  See eg., Stein Jewelry Co. v. United Parcel Serv., Inc., 228 F.Supp.2d 304, 307-308 (S.D.N.Y. 2002) (Whether carrier provided adequate notice that carrier's tariff excluded shipped goods from insurance coverage presented a factual issue not appropriate for determination on a motion to dismiss.).  For example, plaintiffs deny that the receipt given to them by the Quick courier contained any writing on the reverse side, which according to Quick, would have contained the liability limitation provisions.  Quick, however, contends that "plaintiffs cannot claim that they only received a single page receipt with no terms and conditions" because "[a] complete bill of lading form, with the contractual language and all of the pages, is included in the collection kit provided by CBR to

24

each of its customers" and plaintiffs admit that CBR provided them with the pre-printed Quick label.  (Quick's Supplemental Mem. at 9).  The nature and full content of the materials provided to plaintiffs is a factual matter for discovery.  Additionally, CBR's website advises that the collection kit is "pre-labeled and ready to be shipped 'as-is.'"  Such instructions would not necessarily place customers on notice that it was incumbent upon them to read the terms purportedly set forth in the shipment forms.  Furthermore, it cannot be ascertained, prior to discovery, whether the plaintiffs were even aware that they were allegedly entering into a transportation contract with Quick when Mr. Polesuk signed the receipt.  Accordingly, Quick's application to limit its liability to $200, in accordance with the purported terms of the receipt/bill of lading, is premature.

CBR and plaintiffs, however, argue that the application of the release value doctrine to shipment of cord blood should be deemed void as against public policy, and hence Quick's ability to limit its liability would not be the proper subject of discovery.  Such a blanket prohibition of the release value doctrine to any shipments of  "potentially life-saving substance" is  inappropriate.  For example, the Eighth Circuit Court of Appeals, in Hampton v. Federal Express Corp., 917 F.2d 1119 (8th Cir. 1990), held that the release value doctrine applied to a shipment of potentially lifesaving blood samples.  In Hampton, blood samples, of an infant cancer patient in need of a bone marrow transport, were to be shipped to a medical center where they were to be matched with the most suitable of five potential donors.  A contract of carriage entered into by the hospital-shipper and common carrier clearly limited the carrier's liability to $100, and the shipper did not avail itself of the opportunity to declare a higher value.  The carrier had no knowledge of the nature of the content of the shipment.  In a wrongful death action

25

commenced by the infant's father against the carrier, the Eighth Circuit held that the carrier was "entitled to partial summary judgment under the released value doctrine, limiting its liability to $100, the amount stated in the contract of carriage between it and the shipper" because the "nature and extent of damages suffered by plaintiff . . . were not reasonably foreseeable to the carrier . . ." <u>Hampton</u>, 917 F.2d at 1120.   The Eighth Circuit reasoned that if the carrier "had known of the contents of the package, it might have charged a higher rate, exercised additional care, have obtained insurance, or might not have accepted the responsibility." <u>Id</u>. at 1125.

Unlike <u>Hampton</u>, in the case at bar the special instructions section of the purported bill of lading indicates that the content of the shipment was an umbilical cord, and Quick was contractually obligated to have obtain additional insurance for such shipments pursuant to the terms of its Service Agreement with CBR.  Thus, the concerns expressed in <u>Hampton</u> that the carrier could not reasonably foresee the true extent of its liability exposure and obtain insurance commensurate with such exposure, are not concerns present in the instant case.  Although the release value doctrine is not void as a matter of law,  whether the release value doctrine operates to limit Quick's liability is a factual issue.

### CBR's Limitation of Liability

However, resolution of this factual issue will have no bearing on CBR's exposure of liability.  CBR argues that, pursuant to the Carmack Amendment, its liability should be limited in accordance with the $200 limitation set forth in the purported bill of lading because CBR was a third-party beneficiary thereof, as well as an implied carrier.  CBR maintains that at all relevant times Quick was acting as its agent, and that "it was CBR which ultimately placed the cord blood

26

within the stream of commerce albeit with the help of Quick and American Airlines as intermediaries." (CBR's Mem. at 6). In addition to acting as CBR's agent, CBR asserts that Quick was simultaneously acting for CBR's benefit when it attempted to transport the blood to CBR's facility, a necessary step in order for CBR's contract with plaintiffs to be effectuated. Thus, CBR claims it suffered injury as a result of the non-delivery because, *inter alia*, it exposed CBR to liability to the plaintiffs. CBR therefore asserts that CBR was clearly a third-party beneficiary of Quick's alleged bill of lading agreement with the plaintiffs and is, therefore, entitled to the same benefits of the limitation of liability as its agent, Quick.

The Carmack amendment applies only to carriers and freight forwarders. See, 49 U.S.C. § 14706(a)(1). CBR is not a carrier, and its self-serving characterization of itself as an "implied carrier" does not alter its legal status. According to the terms of CBR and Quick's Service Agreement, the "purpose" of the Agreement was that "CBR requires delivery service" and that Quick "is in the business of providing services of the type required by CBR and has agreed to furnish the same . . . " (Grande Decl. Ex. A at 1). The plain language of the Service Agreement indicates that CBR is not, in any manner, a provider of transportation services, but rather is one in need of such services. Moreover, CBR's contention that Quick was acting as its agent is similarly belied by the express provisions of the Service Agreement. The Agreement explicitly provides that Quick is not the agent of CBR, and that the relationship between the parties is solely that of an independent contractor relationship. A party who enters into a service contract, with regard to an item to be delivered to it, does not gain a carrier-type status merely because it also contractually arranged for the transportation of that item by a carrier.

Nor is there any basis to find that CBR was an intended third-party beneficiary of the

27

alleged bill of lading.  "Under the Carmack Amendment, shipping 'contracts purporting to grant immunity from, or limitation of, liability must be strictly construed and limited to intended beneficiaries, for they are not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding of the contracting parties.'" St. Paul Fire & Marine Ins., Co. v. Schneider Nat'l Carriers, Inc., 2006 WL 522455, at * (S.D.N.Y. Mar. 3, 2006) (quoting Toyomenka, Inc. v. S.S. Tosaharu Maru, 523 F.2d 518, 521 (2d Cir. 1975)).  Under New York law, only an intended, rather than an incidental, beneficiary of a contract can assert a third-party beneficiary claim thereunder.  Mortise v. United States, 102 F.3d 693, 697 (2d Cir. 1996); National Westminster Bank PLC v. Grant Prideco, Inc., 261 F.Supp.2d 265, 272 (S.D.N.Y. 2003).  "[O]ne is an intended beneficiary if one's right to performance is appropriate to effectuate the intention of the parties' to the contract and either the performance will satisfy a money debt obligation of the promisee to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  Roosevelt Islanders for Responsible Southtown Dev. v. Roosevelt Island Operating Corp., 735 N.Y.S.2d 83, 98 (N.Y. App. Div. 2001) (internal quotation marks and citations omitted); see also, Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir. 1991).  "An incidental beneficiary is a third party that may derive a benefit from the performance of a contract though that party is neither the promisee nor the one to whom performance is to be rendered."  Roosevelt Islander, 735 N.Y.S.2d at 98. In determining whether a third-party is an intended beneficiary of a contract, "the actual intent of the parties is critical."  Edge Mgt. Consulting Inc. v. Blank, 807 N.Y.S.2d 353, 368-69 (N.Y. App. Div. 2006). The best evidence of the contracting parties intent

as to whether a third party was an intended beneficiary to a contract, is the language of the agreement itself.  Id. at 369.  Nevertheless, "the obligation to perform to the third-party beneficiary need not be expressly stated in the contract."  Trans-Orient Marine, 925 F.2d at 573.

An examination of the surrounding circumstances, in addition to the purported agreement itself, reveals that neither Quick nor the plaintiffs entered into the claimed transportation contract with the intention that CBR would be a third-party beneficiary thereof.  CBR's contention that the purported bill of lading inured to CBR's benefit, because it was necessary in order for CBR to effectuate its contract with the plaintiffs, merely makes CBR an incidental beneficiary of the contract, as opposed to an intended beneficiary.

Accordingly, CBR's cross-motion to dismiss the complaint or, in the alternative, to limit its potential liability to $200, is denied.

## ARBITRATION OF CROSS-CLAIMS

Quick maintains that the cross-claims asserted against it by CBR should be dismissed or stayed pending arbitration.  CBR does acknowledge that the Service Agreement "ostensibly provides that disputes between CBR and Quick 'under this Agreement' should be resolved by arbitration."  (CBR Reply Mem. at 8).  CBR, however, argues that the arbitration provision in the Agreement is inapplicable because the subject dispute "arises from the loss or destruction of [the] cord blood by Quick and or American Airlines and, therefore, is not a dispute arising under the Provider Agreement between CBR and Quick."  (Id.).  CBR additionally claims that Quick has been remiss in initiating the arbitration of the issues.  CBR further argues that the Service Agreement "does not provide that any arbitration would be binding on the parties and, as a result,

it is likely that CBR's cross-claims against Quick would end up before this Court regardless of an arbitrator's decision on the merits."  (<u>Id</u>.).

 The Federal Arbitration Act ("FAA") " was intended to promote the enforcement of privately entered agreements to arbitrate 'according to their terms.'" <u>Bank Julius Baer & Co., Ltd. v. Waxfeld, Ltd.</u>, 424 F.3d 278, 281 (2d Cir. 2005) (<i>quoting</i> <u>Mastrobuono v. Sherson Lehman Hutton, Inc.</u>, 514 U.S. 52, 54 (1995)).  By virtue of the FAA, "Congress has declared a strong federal policy favoring arbitration as an alternative means of dispute resolution."  <u>Id</u>. (citation and internal quotation marks omitted).  The language of the subject arbitration clause reveals that CBR and Quick agreed to arbitrate, and CBR concedes that the Agreement "ostensibly" provides that disputes thereunder are subject to arbitration.  Where "the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability.  <u>Ace Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.</u>, 307 F.3d 24, 29 (2d Cir. 2002).

 The arbitration clause in the Service Agreement does not limit the nature of the disputes subject to arbitration, but rather broadly provides that any disputes under the agreement are arbitrable.  "Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it."  <u>Louis Dreyful Negoce S.A. v. Blystad Shipping & Trading Inc.</u>, 252 F.3d 218, 224 (2d Cir. 2001) (citation and internal quotation marks omitted).   "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  <u>Moses H.</u>

<u>Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983).

  CBR's cross-claims fall within the scope of the arbitration agreement.  The cross-claims are premised on allegations of Quick's negligence, recklessness and/or carelessness, Quick's obligation to indemnify CBR, and Quick's breach of the Service Agreement by failing to obtain and maintain the requisite liability insurance coverage naming CBR as an additional insured. Such issues are not merely collateral matters to the Service Agreement, but rather are directly related to the provisions of the Agreement.  Accordingly, litigation of the cross-claims against Quick are stayed pending arbitration.  <u>See</u>, 9 U.S.C. § 3.[9]

### CONCLUSION

  Plaintiffs' motion for leave to file an amended complaint is granted, but only to the extent that they may assert a Carmack Amendment claim against defendant Quick, as well as add further factual allegations.  Defendant Quick's motion to dismiss the complaint, or in the alternative to limit its liability, is granted to the extent that the state law claims, asserted in the original complaint are dismissed.  Quick's motion to dismiss, or in the alternative to stay, the cross-claims asserted against it by defendant CBR is granted to the extent that the cross-claims are stayed pending arbitration.  Defendant CBR's motion to dismiss the complaint, or in the

---

[9] Section 3 of 9 U.S.C. provides:

  If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

alternative to limit its liability, is denied in all respects.

Dated: New York, New York
       September 28, 2006

SO ORDERED:

GEORGE B. DANIELS
United States District Judge

32